NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____
:
THE COHEN FAMILY 2007 TRUST :
BY TRUSTEES DAVID J. COHEN AND :
ABRAHAM J. COHEN :
:
               Plaintiff, :
:   Civ. Action No. 17-12648-BRM-LHG
      v. :
:   **OPINION**
THE UNITED STATES OF AMERICA, :
EX REL. THE U.S. ARMY CORPS OF :
ENGINEERS, :
:
              Defendant. :
_____:

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is Defendant The United States, Ex. Rel. The U.S. Army Corps of Engineers ("ACOE") Motion to Dismiss for Lack of Jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). (ECF No. 12.) Plaintiff The Cohen Family 2007 Trust by Trustees David J. Cohen and Abraham J. Cohen (the "Cohen Trust") opposes the Motion. (ECF No. 17.) Having reviewed the parties' submissions filed in connection with the Motion and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below, and for good cause shown, ACOE's Motion to Dismiss is **GRANTED.**

**I.    BACKGROUND**

This tort matter arises from a beach-replenishment project undertaken by the ACOE in the aftermath of Hurricane Sandy. The Cohen Trust is a trust organized under the laws of New Jersey and owns land and improvements located in the Borough of Deal, Monmouth County, New Jersey

(the "Cohen Property"). (Am. Compl. (ECF No. 5) ¶ 1.) ACOE is a United States of America agency that:

> designed, implemented, directed and oversaw a beach replenishment project (technically known as the "Coastal Storm Risk management and Erosion Control Project" and the "Atlantic Coast of New Jersey, Sandy Hook to Barnegat Beach Inlet Beach Erosion Control Project, Section I - Sea Bright to Ocean Township; Elberon to Loch Arbour Reach") [(the "Beach Project")] along the New Jersey shoreline, from the Town of Sea Bright to the Manasquan Inlet in Monmouth County. The project was coordinated with the State of New Jersey, each municipality in which work was performed (here the Borough of Deal, Monmouth County) and designed, implemented, directed and overseen by the ACOE.

(*Id.* ¶¶ 2, 6.) "The Beach Project included pumping millions of cubic yards of material to elevate the elevation of beachfront area with onshore slope of 1:10 (vertical to horizontal) and the modification of existing stormwater outfalls." (*Id.* ¶ 6.)

### A. The ACOE's Authority to Regulate Navigable Waterways

Congress delegated to the Secretary of the Army the duty to "prescribe such regulations for the use, administration, and navigation of the navigable waters of the United States as in his judgment the public necessity may require for the protection of life and property, or of operations of the United States in channel improvement, covering all matters not specifically delegated by law to some other executive department." 33 U.S.C. §§ 1; *see* 33 U.S.C. §§ 540, 541. The ACOE's responsibilities include evaluating proposed projects and preparing reports, submitting the reports to Congress with a recommendation setting forth the ACOE's judgment on how to design and implement a proposed project. (Decl. of Anthony Ciorra (ECF No. 12-2) ¶ 4.) Once a project is authorized by Congress, the ACOE prepares a General Design Memorandum ("GDM"), where the ACOE "evaluates alternatives to the proposed project and further evaluates the project in terms of expense and environmental impact." (*Id.*) Next, the ACOE prepares draft plans and specifications to meet the GDM. (*Id.*) Finally, comes the construction and implementation of the project. (*Id.*)

### B. ACOE Project

ACOE allegedly initiated this Beach Project "in response to continued beach erosion and damages incurred along the New Jersey shore as a result of coastal storms such as hurricanes and nor'easters." (*Id.* ¶ 5.) The ACOE submitted its original report to Congress recommending federal action to remedy the erosion incurred along the New Jersey shore in 1956. (*Id.*) It was not until 1989, however, that the ACOE "prepared a GDM analyzing an area of the New Jersey shore that included the area where [the Cohen Property] is located." (*Id.* ¶ 6.) The 1989 GDM evaluated many possible solutions to address the erosion in the area, ultimately, recommending "a plan for this area of the New Jersey shore that included a 100[-]foot[-]wide berm, as well as groin and outfall modifications." (*Id.* ¶ 7.)

On October 29, 2012, Superstorm Sandy struck the New Jersey Coast, including the shoreline near the Cohen Property. (*Id.* ¶ 8.) On January 29, 2013, Congress passed the 2013 Disaster Relief Appropriations Act, which provided "supplemental appropriations for the fiscal year ending 30 September 2013, to conduct investigations and to improve and streamline disaster assistance for Hurricane Sandy, and for other purposes, at full federal expense." (*Id.* ¶ 9.) In approximately August of 2014, the ACOE finalized the Integrated Hurricane Sandy Limited Reevaluation Report and Environmental Assessment, "which served as the decision document to use the funds provided by the Hurricane Sandy Relief Bill to perform work to address the problems of beach erosion and storm damage risk identified in the 1989 GDM." (*Id.* ¶ 10.)

On January 16, 2015, the ACOE awarded a contract (the "Contract") to Maser Consulting P.A., ("Maser") to perform the work that forms the basis of the Cohen Trust's Amended Complaint. (*Id.* ¶ 12.) The Contract allegedly "involved construction of an approximately 100 to 295 ft wide beach berm at elevation +9.3 ft North American Vertical Datum 1988 [], with beach

3

fill material amounting to approximately 1.37 MCY (Million Cubic Yards)." (*Id.*) It also included "several groin medications, outfall extensions, as well as other hard structure features at certain existing outfalls." (*Id.*) The ACOE acknowledges that in order for the Beach Project to serve its purpose, "it was necessary to ensure that storm water being discharged onto the newly constructed beach from existing storm water outfall pipes was draining properly into the Atlantic Ocean." (*Id.* ¶ 13; ECF No. 17-1 ¶ 9.) The failure of the water to drain into the Atlantic Ocean would cause pooling water, which would in turn cause beach erosion and safety risks to members of the public using the beach. (ECF No. 12-2 ¶ 13.)

At the time of Superstorm Sandy, the ocean extended to the seawall and there was a municipal 18-inch stormwater outfall pipe (the "Pipe") penetrating through the seawall. (ECF No. 17-1 ¶ 7; ECF No. 5 ¶ 7.) Prior to the Beach Project, the Pipe drained directly into the ocean at the based of the seawall. (ECF No. 5 ¶ 7; ECF No. 12-2 ¶ 14; ECF NO. 17-1 ¶ 7.) The Beach Project did not extend the Pipe beyond the face of the seawall because "previous data did not demonstrate that the volume of storm water from this outfall required any modifications." (ECF No. 12-2 ¶ 14.) "Based on previous data, the [ACOE] expected that the storm water from the outfall near the [Cohen Property] would drain through the sand without creating pooling conditions." (*Id.*) However, after the Beach Project, the outfall drained onto a newly constructed beach at the base of the seawall, causing erosion and pooling water near the Cohen Property. (ECF No. 12-2 ¶ 14 and ECF No. 17-1 ¶ 8.)

Realizing this "drainage issue," the ACOE executed a modification to the Maser Contract for the construction of a temporary outfall extension to mitigate the drainage issue in the area until a permanent solution was executed. (ECF No. 12-2 ¶ 15.) The ACOE eventually "decided to construct an underground drainage structure (dry well) as a permanent solution to address the

4

drainage issue at the outfall near the [Cohen property]." (*Id.* ¶ 16; ECF No. 17 ¶ 16.) It made this decision after allegedly evaluating many different alternatives, policy considerations, and engineering options. (*See* ECF No. 12-2 ¶¶ 17-22.) Therefore, the ACOE presented a drawing showing the proposed dry wells to Maser in the fall of 2015. (ECF No. 17-1 ¶ 17.) Maser expressed some concerns with the plans and specifications. (*Id.* ¶¶ 17-21.) These issues were discussed among representatives of ACOE, the Borough of Deal, and the Cohen Family. (*Id.* ¶ 21.) Nevertheless, the ACOE allegedly went ahead and constructed the dry wells without making changes to the plans and specifications because it believed "this approach would result in outflow draining properly into the Atlantic Ocean, thus protecting the Cohen Property." (*Id.* ¶ 23.)

The dry wells were eventually built with deviations from its own design drawing. (*Id.* ¶ 24.) "According to the design drawings, the two drywells were supposed to be constructed leveled, with their tops at the same elevation. However, as constructed, the two wells' tops are at different elevations, with one well one foot lower than the other." (*Id.*) The Cohen Trust alleges "[t]his difference in elevation created a major issue as more water flowed out of the lower drywell, creating more volume and higher erosive velocity from the lower drywell." (*Id.*) The Cohen Trust further argues "[t]he drywells as constructed failed to meet the goals set by the ACOE of capturing, containing, and infiltrating stormwater runoff." (*Id.* ¶ 28.) It contends "[t]he drywells' poor performance is exacerbating damage to the Seawall which has already taken place due to the ACOE's breach replenishment activities." (*Id.* ¶ 32.)

### A. Procedural History

On December 6, 2017, the Cohen Trust filed an initial Complaint. (ECF No. 1.) The Complaint was amended on January 11, 2018. (ECF No. 5.) On April 16, 2018, ACOE filed a Motion to Dismiss for Lack of Jurisdiction. (ECF No. 12.) The Cohen Trust opposes the Motion. (ECF No. 17.)

## II. LEGAL STANDARD

When a defendant moves to dismiss a claim for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), the court must determine whether defendant is making a "facial or factual challenge to the court's subject matter jurisdiction." *Gould Elecs., Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000); *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). Under a facial attack, the movant challenges the legal sufficiency of the claim, and the court considers only "the allegations of the complaint and documents referenced therein and attached thereto in the light most favorable to the plaintiff." *Gould Elecs.*, 220 F.3d at 176; *Mortensen*, 549 F.2d at 891 ("The facial attack does offer similar safeguards to the plaintiff [as a 12(b)(6) motion]: the court must consider the allegations of the complaint as true."). The Court "may dismiss the complaint only if it appears to a certainty that the plaintiff will not be able to assert a colorable claim of subject matter jurisdiction." *D.G. v. Somerset Hills Sch. Dist.*, 559 F. Supp. 2d 484, 491 (D.N.J. 2008) (citing *Cardio–Medical Assoc., Ltd. v. Crozer–Chester Med. Ctr.*, 721 F.2d 68, 75 (3d Cir. 1983)).

Under a factual attack, however, the challenge is to the trial court's "very power to hear the case." *Mortensen*, 549 F.2d at 891. Thus:

> [T]here is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not

preclude the trial court from evaluating for itself the merits of jurisdictional claims.

*Id.* Moreover, in a factual attack, "the court may consider and weigh evidence outside the pleadings to determine if it has jurisdiction." *Gould Elecs.*, 220 F.3d at 178.

Regardless of the analysis, the plaintiff bears the burden of demonstrating the existence of subject matter jurisdiction. *See McCann v. Newman Irrevocable Tr.*, 458 F.3d 281, 286 (3d Cir. 2006); *Lightfoot v. United States*, 564 F.3d 625, 627 (3d Cir. 2009) (citing *Carpet Grp. Int'l v. Oriental Rug Importers Ass'n*, 227 F.3d 62, 69 (3d Cir. 2000)). Here, Defendants are asserting a factual 12(b)(1) challenge, and both parties provide and heavily rely on competing declarations. As such, the Court is free to consider and weigh the evidence provided outside the pleadings to determine if it has jurisdiction. *Gould Elecs.*, 220 F.3d at 178.

## III. DECISION

ACOE argues the Court lacks subject matter jurisdiction over this matter due to the discretionary function exception to the Federal Tort Claims Act and pursuant to the Flood Control Act, 33 U.S.C. § 702c. (*See* ECF No. 12-1.) The Cohen Trust argues the ACOE does not fall within the discretionary function exception and that the Flood Control Act does not apply. (*See* ECF No. 17.)

As a preliminary matter, the Flood Control Act "bars recovery where the Federal Government would otherwise be liable under the Federal Tort Claims Act . . . for personal injury caused by the Federal Government's negligent failure to warn of the dangers from the release of floodwaters from federal flood control projects." *Cent. Green Co. v. United States*, 531 U.S. 425, 429 (2001); *PNC Bank Nat'l Ass'n v. United States Army Corps of Engineers*, No. 13-374, 2018 WL 1531790, at *4 (N.D. Ind. Mar. 29, 2018) ("It has been held that the Federal Torts Claim Act does not in any way modify or repeal the provisions of the Flood Control Act."). Because the Court

7

finds ACOE is immune from suit pursuant to the Flood Control Act, it need not decide whether the Federal Torts Claims Act applies or whether ACOE is immune pursuant to the discretionary function exception. *See Burlison v. United States*, 627 F.2d 119, 120–21 (8th Cir. 1980).

That Flood Control Act states, "No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place." 33 U.S.C. § 702c. The Supreme Court has reviewed this immunity provision in connection with water flooding from a federally owned canal in *Central Green.* The Court held that to determine whether the Government is entitled to immunity, courts should look to the "character of the waters" that caused the damage at issue and the purposes behind their release, not to the character of the federal project or the purposes it serves. *Cent. Green Co.*, 531 U.S. at 433. The *Central Green Court* noted it "is relatively easy to determine that a particular release of water that has reached flood stage is 'flood water,' . . . or that a release directed by a power company for the commercial purpose of generating electricity is not." *Id.* at 435.

The Fifth Circuit has held under *Central Green*, "the government enjoys immunity only from damages caused by flood waters released on account of flood-control activity or negligence therein." *In re Katrina Canal Breaches Litigation*, 696 F.3d 436, 444 (5th Cir. 2012). "Thus, after *Central Green*, waters have the immune character of 'flood waters' if the government's link to the waters is through flood-control activity. That is to say, the government's acting upon waters for the purpose of flood control is flood-control activity, and flood-control activity is what gives waters an immune character." *Id.* at 466. The *Katrina* court further concluded: "We recognize immunity for any flood-control activity engaged in by the government, even in the context of a project that was not primarily or substantially related to flood control." *Id.* at 447.

Since *Central Green*, courts have found that the Flood Control Act bars claims for tort damages similar to those at issue here. In *PNC Bank*, the plaintiff alleged its commercial property had experienced flooding after the ACOE removed a water drain pipe as part of building a flood control levy. *PNC Bank*, 2018 WL 1531790, at *1. In finding the ACOE was shielded by the Flood Control Act, the court found "the statute protects United States from liability even when it's flooding solution in one area causes floods in another. Just as the Corps has no liability for opening a dam that has reached flood stage eve if it knows that properties down the river will be flooded." *Id.* at 3.

Likewise, in *A.O. Smith Corp. v. United States*, No. 12-0429, 2013 WL 771919, at 1 (M.D. Tenn. Feb. 28, 2013), *aff'd*, 774 F.3d 359 (6th Cir. 2014), the plaintiff allegedly sustained property damage as a result of the Cumberland river flood and contended that the ACOE caused the damage by mismanaging a dam that was located upriver. In concluding that the Flood Control Act barred any tort claim, the court found that "even if Old Hickory Dam in not characterized as a 'flood control project,' . . . the alleged misconduct was flood control activity involving flood waters" because the dam had been caused by floodwaters. *Id.* at 3.

Here, it is undisputed that the "character of the waters" that caused the damage at issue was "flood waters." The Cohen Trust admits the seawall damage was caused by "stormwater." (ECF No. 5 ¶ 8 (stating "[d]ue to the slope of the newly added sand and the distance from the end of the Pipe to the relocated shoreline, stormwater pouring onto the newly added sand at the end of the Pipe flowed under the Seawall undermining the Seawall and the remainder of the Cohen Property behind (west of) the Seawall"); ECF No. 17 at 4 (stating that the only place for the "stormwater" to go was under the seawall, "where its velocity and movement resulted in a large scour hole at the Pipe's original base, causing or exacerbating movement in the Seawall and the ground

subsidence at the top of the Seawall").) Cohen Trust's argument that the Flood Control Act does not apply because ACOE's actions to remedy erosion led to the to the flood is misplaced. Indeed, *PNC Bank* found the Flood Control Act shielded the ACOE "from liability even when it's flooding solution in one area causes floods in another." *Id.* at 3.

Moreover, the flood waters were released on account of "flood-control activity or negligence." The ACOE initiated this project "in response to continued beach erosion and damages incurred along the New Jersey shore as a result of coastal storms such as hurricanes and nor'easters." (ECF No. 12-2 ¶ 5.) The ACOE submitted its original report to Congress recommending federal action to remedy the erosion incurred along the New Jersey shore in 1956. (*Id.*) In 1989, the ACOE "prepared a GDM analyzing an area of the New Jersey shore that included the area where [the Cohen Property] is located." (*Id.* ¶ 6.) The 1989 GDM evaluated many possible solutions to address the erosion in the area, ultimately, recommending "a plan for this area of the New Jersey shore that included a 100[-]foot[-]wide berm, as well as groin and outfall modifications." (*Id.* ¶ 7.) On October 29, 2012, Superstorm Sandy struck the New Jersey Coast, including the shoreline near the Cohen Property. (*Id.* ¶ 8.) On January 29, 2013, Congress passed the 2013 Disaster Relief Appropriations Act, which provided "supplemental appropriations for the fiscal year ending 30 September 2013, to conduct investigations and to improve and streamline disaster assistance for Hurricane Sandy, and for other purposes." (*Id.* ¶ 9.) In August of 2014, the ACOE finalized the Integrated Hurricane Sandy Limited Reevaluation Report and Environmental Assessment, "which served as the decision document to use the funds provided by the Hurricane Sandy Relief Bill to perform work to address the problems of beach erosion and storm damage risk identified in the 1989 GDM." (*Id.* ¶ 10.) This Court concludes the ACOE's conduct was for flood control. Accordingly, the Flood Control Act shields ACOE from liability in this matter.

**IV.	CONCLUSION**

For the reasons set forth above, ACOE's Motion to Dismiss for lack of subject matter jurisdiction is **GRANTED**.


Date: November 20, 2018	*/s/Brian R. Martinotti*
	**HON. BRIAN R. MARTINOTTI**
	**UNITED STATES DISTRICT JUDGE**